Plaintiff appeals the value of nine outdoor advertising signs (a.k.a. billboards) added to the assessment and tax rolls in 2006 as omitted property.[1] Each sign has a separate assessor account number.[2] The omitted property assessments added value for tax years 2000-01 through 2005-06, except for sign #4 (Account 10985387), for which value was only added back to the 2001-02 tax year.[3] Plaintiff also asserts double taxation by Defendant on two of the signs, contending that they were valued as both personal and real property.
Trial was held July 18, 2007. Plaintiff was represented by Stephen Croft (Croft), Plaintiff's registered agent and manager/marketer. Testifying for Plaintiff were Cory Shumway (Shumway), General Manager, Lamar Outdoor Advertising; and Bernie Conklin (Conklin), former Regional Sales Manager, Viacom Communications. Defendant was represented by David Arrasmith (Arrasmith), Deputy Assessor, Jackson County. The parties submitted post trial briefs, and the record closed August 2, 2007.
 I. STATEMENT OF FACTS
Plaintiff owns nine billboards in Jackson County visible from state highways. Plaintiff is the second largest owner of billboards in the county. Oregon requires permits for the placement of billboards along state highways. ORS *Page 448 377.715; ORS 377.725.[4] All of Plaintiff's signs were built without permits, and are nonconforming under state law, as explained more fully in the analysis below. Additionally, the parties referred to Oregon as a closed-permit state because there is a limit to the number of signs allowed in Oregon. That limit is 2, 500, and is met with the existing signs and certificates (a state license or permit to erect a sign in the future), which means that no new permits are issued.
Plaintiff's nine signs range in size from 10 x 20 feet to 10 x 28 feet. Six of the nine signs are double-faced (i.e., constructed with two "faces" to allow two signs, one on each side), and the remaining three are single-face signs. The signs were built by the former owner of the company between 1993 and 2000. Plaintiff reports the following gross income for the signs: $9,210 (sign #1), $3,675 (sign #2), $16,600 (sign #3), $7,374 (sign #5), $22,846 (sign #6), $6,600 (sign #7), $7,804 (sign #8), and $23,460 (sign #9). There is no income information for sign #4.
Defendant was initially unaware of the billboards, and, consequently, they escaped assessment and taxation for many years. Defendant became aware of their existence in 2006 and issued omitted property assessment notices adding the values of the signs to the rolls back to the 2000-2001 tax year. Plaintiff challenged Defendant's value determinations administratively as provided in ORS 311.219, and, as a result, the assessor reduced the values. Final notices were issued with the newer, reduced values, in mid-December 2006, for all but one of the nine billboards; the final notice for sign #4 was issued March 5, 2007. Plaintiff was still unhappy with those values and has appealed to this court.
For purposes of its omitted property assessments, Defendant determined that the real market values (RMV) for the signs, for the 2005-06 tax year, were between $27,700 (sign #2) and $190,350 (sign #9), with three of the nine signs valued well in excess of $100,000. The current total (cumulative) RMV on the assessment and tax rolls for the nine signs for tax year 2005-06 is $799,190. Plaintiff insists the *Page 449 
values of all nine signs exceed actual market value. Plaintiff is requesting a total reduction in value to $135,150, asserting that the RMV of the signs for all years under appeal is between $12,250 (sign #8) and $18,750 (sign #9). Defendant acknowledges that reductions are in order for eight of the nine signs. Defendant requests values between $29,700 (sign #5) and $126,500 (sign #9), resulting in an overall reduction from $799,190 to $580,700. Defendant requests an increase for sign #2 from $27,700 to $56,500.
The numbers for the 2005-06 tax year are as follows:
Sign No. Account No. Current RMV Ptf's Request Def's Request
 1 10984032 $ 79,250 $ 13,050 $ 60,300
 2 10984033 $ 27,700 $ 12,250 $ 56,500
 3 10984025 $ 134,060 $ 16,950 $ 92,600
 4 10985387 $ 92,860 $ 16,950 $ 53,100
 5 10984031 $ 39,900 $ 14,500 $ 29,700
 6 10984030 $ 146,510 $ 15,950 $ 95,900
 7 10984026 $ 48,460 $ 14,500 $ 35,100
 8 10984052 $ 40,100 $ 12,250 $ 31,000
 9 10984028 $ 190,350 $ 18,750 $ 126,500
TOTAL: $ 799,190 $ 135,150 $ 580,700

Plaintiff proposes that the RMV be determined based on the cost approach to value. Defendant relies on both the income and cost approaches. Defendant did provide some information on comparable sales, but due to the limited number of sales in Oregon, Defendant did not rely on that approach in its value estimate.
 II. ISSUES
The parties have presented two issues for the court to resolve.
(1) Are billboards classified as real or personal property?
(2) What are the values of the billboards?
 III. ANALYSIS
A. Classification of the Property
Plaintiff contends that the billboards should be valued as personal property. Defendant disagrees, arguing that *Page 450 
the Tax Court's decision in Seven-Up Bottling Co. ofSalem v. Dept. of Rev., 10 OTR 400 (1987), established the rule for determination of property classification based on affixation, and following the subsequent issuance by the Department of Revenue (DOR) of an Opinion and Order concerning billboard classification, the DOR promulgated an administrative rule — OAR 150-308.115[5] — which requires billboard owners to annually file real property returns. More importantly, the DOR's rule specifically provides for the classification of "billboards" as real property. The rule provides that "[a]ll billboards that are erected upon the land or affixed to buildings or other permanent structures shall be classified as real property." OAR 150-308.115. Those authorities establish the rule in Oregon that billboards are real property, at least for purposes of property assessment and taxation.
B. Valuation
1. RMV
 a. Background — HBA, OMIA, and Plaintiff's Experience Thereunder
Oregon regulates billboards under the Oregon Motorist Information Act (OMIA); ORS 377.700 to ORS 377.840; and, ORS377.992, which was enacted to comply with the federal Highway Beautification Act of 1965 (HBA), 23 USC § 131. OutdoorMedia Dimensions Inc. v. State of Oregon, 331 Or 634, 637,20 P3d 180 (2001) (Outdoor Media I.) The court explained in Outdoor Media I that "[t]he HBA established federal standards for erecting and maintaining outdoor advertising signs, displays, and devices along interstate and federally aided primary highways." Id.
The HBA requires states to provide "effective control" of outdoor advertising signs or risk losing a portion of their federal highway funds. Id. "`Effective control' essentially requires states to prohibit all outdoor advertising signs that are visible from an interstate or primary highway, unless a particular sign meets one of five statutory exceptions or is located in an industrial or commercial zone."Id. *Page 451 
The OMIA comprehensively regulates signs visible from public highways. Generally speaking, the OMIA requires such signs to have a permit, regulates the location of the signs, "and effectively caps the number of permits at the number of outdoor advertising signs located in commercial or industrial zones as of June 12, 1975." Outdoor Media Dimensions v. Dept. ofTransportation, 340 Or 275, 281, 132 P3d 5 (2006) (Outdoor Media II.) According to the parties, that "cap" is approximately 2, 500 signs statewide, of which approximately 700 exist on paper only (i.e., there is a valid permit allowing for a sign but no sign has been erected).
Although the permitting requirements were struck by the Oregon Supreme Court in 2006 in Outdoor Media II, the legislature reacted in 2007 by enacting legislation (House Bill 2273-A) to amend the applicable statutes to impose billboard regulations similar to those previously in existence, including the permit requirements.[6] See, e.g., ORS 377.715; ORS377.725 (2007) (requiring permits and annual renewals). Plaintiff's signs do not have the required permits and, according to the uncontroverted testimony, do not meet the requirements for a lawful outdoor advertising sign. They are therefore at risk of compelled removal by the state. Moreover, prior to the Supreme Court's 2006 decision in Outdoor MediaII, Oregon required permits and Plaintiff's signs lacked such permits. Thus, on the applicable assessment dates in this case, Plaintiff's signs were nonconforming. The new legislation does provide for the issuance of permits for pre-existing signs in certain circumstances. ORS 377.712 (2007).[7] However, it is not clear that Plaintiff's signs comply with the statutory requirements for the issuance of such permits. Moreover, the legislative updates occurred after the assessment dates that are relevant in this case, and market *Page 452 
participants at that time would not be aware of those subsequent changes.
There are additional risks involved in the ownership of highway roadside billboards. Plaintiff leases the land on which its billboards are located, which is typical in the industry. The lease agreements contain a removal clause whereby the landowner can require removal of the sign with 30 or 60 days' notice. Plaintiff was forced to remove several signs under such removal clauses due to the landowner's planned development of the property.
The signs are also heavily regulated by the state (in addition to the permit requirements), and are subject to removal through condemnation at the behest of the government for road construction or expansion. Plaintiff was forced to remove several signs because of highway projects, and was only compensated in one instance. The state has required the removal of some of Plaintiff's other signs (not any of the nine under appeal herein) for noncompliance with state regulations pertaining to roadside billboards. Such regulations include compliance with location, size, and zoning requirements, as well as compliance with applicable federal laws. According to the uncontroverted testimony, Plaintiff had to remove 10 signs after its defeat at the Supreme Court in 2001 in OutdoorMedia I because of the failure to comply with those regulations.
The state will issue a permit for the relocation of a lawfully erected sign as provided in ORS 377.767, but Plaintiff's signs were not originally erected in compliance with OMIA and relocation permits are therefore not available. Accordingly, if the signs are required to be removed either by the state or by the lessor of the land on which the signs are located, they cannot be used elsewhere unless Plaintiff purchases one of the approximately 700 certificates in existence for which no signs have been erected. Those realities all create risk, which has a negative impact on value.
 b. Valuation Standards and the Burden of Proof
The court's task is to determine the RMV of the subject property as of the assessment dates for the tax years *Page 453 
at issue. The applicable assessment dates in this case are January 1 for each of the six calendar years 2000 through 2005.[8] ORS 308.007; ORS 308.210. ORS 305.412 authorizes the Tax Court to determine RMV "on the basis of the evidence before [it], without regard to the values pleaded by the parties."[9]
RMV is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction[.]" ORS 308.205. In other words, the likely selling price in a hypothetical transaction involving the subject property, where buyer and seller are unrelated and each is acting in his own best interest, without any undue influences driving their behavior.
The burden of proof in an appeal to the Tax Court is a "preponderance" of the evidence. ORS 305.427.[10] The Oregon Supreme Court has stated that:
 "`Preponderance' derives from the Latin word `praeponderare,' which translates to `outweigh, be of greater weight.' 8 Oxford English Dictionary 1289 (1933). With regard to the burden of proof or persuasion in civil actions, it is generally accepted to mean the greater weight of evidence." *Page 454 
Riley Hill General Contractor v. Tandy Corp.,303 Or 390, 394, 737 P2d 595 (1987). This court has previously ruled that "[preponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept.of Revenue, 4 OTR 302, 312 (1971).
The burden falls upon the party seeking affirmative relief. ORS305.427. In this case, both parties are seeking relief. Each side therefore shoulders the burden of proof as to its particular request. Union Pacific Railroad v. Dept. ofRev., 315 Or 11, 17, 843 P2d 864 (1992) (ruling that each party had the burden of proof with respect to the relief it sought). Accordingly, the court will review the evidence as a whole and grant relief to the party with the most convincing evidence.[11]
 c. Valuation Evidence
The parties both agree that value reductions are in order for at least eight of the nine billboards. As to those signs, then, the only question is the magnitude of the reduction. Defendant requests an increase in sign #2 from $27,700 to $56,500, while Plaintiff requests a reduction to $12,250.
 (1) Plaintiff's Evidence
Plaintiff estimated the value of its signs under the cost approach, using a combination of estimated and actual costs. Plaintiff presented receipts for certain materials and labor from 2006 and 2007, and arrived at an estimated billboard cost of $14,858. However, there are problems with Plaintiff's cost approach. Shumway's testimony shows that Lamar Outdoor Advertising paid between $16,000 and $25,000 to acquire a signed ground lease and the required city permits necessary to construct a billboard, and that Plaintiff only allocated $1,464 to those items. Plaintiff also appears to have underestimated the cost of labor, using a rate of $13 per hour for all labor, including excavation and *Page 455 
electrical work, despite the fact that Plaintiff's receipts show hourly rates of $85 and $75, respectively, for those two services.
Plaintiff also presented evidence of failed efforts to sell the subject signs. According to the testimony of Croft and Conklin, in 2002, Plaintiff offered to sell the nine billboards here at issue, and possibly two others, to Viacom for approximately $190,000. Viacom countered with an offer of $160,000. Plaintiff's asking price and Viacom's counteroffer were both considerably below the cumulative RMV on the rolls, which is approximately $800,000. Viacom's counter-offer was contingent upon assurances that the signs could be permitted. Viacom could not get a guarantee from ODOT that permits could be obtained. Viacom was also concerned that the signs failed to meet current federal structural requirements imposed after two people in Georgia were killed by a blown-down sign during a windstorm. Viacom's concerns back in 2002 prevented the parties from consummating the deal.
 (2) Defendant's Evidence
Defendant's estimated values are based on a combination of the cost and income approaches to value. Defendant gave the greatest weight to the income approach. Defendant cites this court's decision in Wilcox LLC v. Multnomah CountyAssessor as support for a primary reliance on the income approach, because that is the approach that best represents the reason buyers select a billboard for purchase. TC-MD No 990510C (Jan 13, 2000).
For its income approach, Arrasmith used a combination of actual and estimated income, a vacancy rate of seven percent, market evidence for ground lease costs, lighting, insurance, and Plaintiff's reported management expense of 20 percent, to arrive at net operating income (NOI). Defendant then used a cap rate of 10 percent to estimate the value of Plaintiff's billboards for 2006. Defendant back-trended the estimated values by 2.06 percent per year based on the Portland annual Consumer Price Index to establish a value for the 2000-2001 tax year. MAV was then determined by applying the ratio of average maximum assessed value to average real market value for similarly classified property. *Page 456 
Defendant's capitalization rate is a composite of an extrapolated rate of 9.96 percent derived from a single billboard sale in Lane County, and a built-up cap rate of 10 percent using the band-of-investment method. Croft asserts that the vacancy rate should be higher, but presented no market evidence to support that claim.
Defendant's cost approach recognizes direct costs, indirect costs, and entrepreneurial profit. Arrasmith used cost factors reported in a DOR publication pertaining to billboards. Significantly, Arrasmith increased the adjusted base cost of six of the nine signs by 100 percent for entrepreneurial profit, and by 50 percent for the remaining three signs. Arrasmith rejected DOR's estimated entrepreneurial profit figure of 10 percent because it extrapolated a profit of 246 percent from the sale of the billboard in Eugene (using the sale price of $225,000 minus the construction cost of $65,000). Also, Arrasmith found a billboard appraisal valuation article, which stated that "many appraisers are surprised to learn that the market price for a billboard is normally many times the cost of construction."
Defendant's estimates fail to account for the risk associated with Plaintiff's nonconforming signs, discussed above. It is for that reason that this court's earlier decision inWilcox does not control here. Defendant could have included risk in its capitalization rate under its income approach, but selected a rate of 10 percent, which does not seem to adequately account for all the associated risks. Defendant also doubles its values under the cost approach by estimating entrepreneurial profit to be 100 percent, despite Arrasmith's acknowledgment that DOR, the agency charged with over-sight of the state's property tax system, has estimated entrepreneurial profit for billboards to be only 10 percent.
Defendant did produce evidence of one sale of a billboard in Oregon in March 2007 for $225,000, reference to which is made above. That sign, however, is in a very good location and is larger than any of the subject signs. It was also built after the Supreme Court's 2006 decision striking the permit requirement and, regardless of future legislation *Page 457 
that may reimpose the permit requirement, Shumway testified that the sign will be "grandfathered in," thereby eliminating the need for such a permit.
Defendant contends that the Oregon Supreme Court's 2006 opinion striking the state permit requirement rendered Plaintiff's signs legal structures, thereby removing the risk of state-compelled removal, which, in turn, increases the value of the signs (or at least eliminates the loss in value stemming from the sign's nonconforming status). The court disagrees, both because legislative enactments subsequent to the court's decision appear to continue the permit requirements and, more importantly, because that court decision was not rendered until after the applicable assessment date for the tax years at issue. Thus, regardless of what impact the court's 2006 opinion has, that outcome was unknown at the time of the applicable assessment dates in this case, which are January 1 for each of the six calendar years 2000 through 2005. Potential market participants at that time would therefore have no knowledge of that outcome and, would instead, be operating under the then-known risks and uncertainties.
 (3) Reconciliation
The court concludes that the best evidence of the RMV of Plaintiff's nine billboards is found in the attempted sale of the signs to Viacom in 2002. Plaintiff was asking approximately $190,000 for the billboards, and Viacom countered with an offer of $160,000. The court believes that the value lies somewhere in the middle and concludes that the cumulative value of the nine billboards is $175,000.
Defendant shall allocate the $175,000 total RMV as it deems appropriate between the nine billboards to arrive at an RMV for each sign as of January 1, 2002. Defendant shall then apply the 2.06 percent backward trend it presented to the court at trial to arrive at an RMV as of January 1, 2000, for each sign except #4. As for sign #4, Defendant shall apply that backward trend to January 1, 2001, which is as far back as the assessment went for that billboard (Account 10985387). Those base year values shall constitute the adjudicated values for each account, as provided in ORS 309.115, *Page 458 
and Defendant shall establish the RMVs for subsequent years consistent with that statute.
 2. Maximum Assessed Value (MAV)
Defendant shall take the resulting base year RMV calculations of each billboard, as set forth immediately above, and apply the applicable ratio of "the average maximum assessed value over the average real market value for the assessment year," (otherwise known as the changed property ratio (CPR)), as provided in ORS 308.153, to establish the MAV for each billboard. According to the court's calculations, the applicable CPR is approximately 0.72, but Defendant shall verify that number and ultimately apply the correct ratio.
C. Double Taxation
Plaintiff contends that two of the nine signs (signs #5 and #7) were taxed by Defendant as personal property and that the taxation of those two signs as real property via the omitted property assessments constitutes double taxation. There was insufficient information on that issue at trial, and the parties were given two weeks to either resolve the matter or submit evidence to the court supporting their positions. The parties did not resolve the issue and Plaintiff did not address it in his post-trial brief. Defendant indicates in its post-trial brief that it researched the question and concluded that those billboards were not previously taxed as personal property. Plaintiff is the party seeking affirmative relief on the issue of double taxation, and therefore bears the burden of proof. ORS 305.427. Plaintiff has not met the burden of proof. Accordingly, the court concludes that there was no double taxation of the two signs (signs #5 and #7).
 IV. CONCLUSION
The court has painstakingly reviewed the evidence and applicable law and concludes that Plaintiff's billboards are properly classified as real property, in accordance with OAR150-308.115, because they are either erected upon the land or affixed to buildings. Additionally, Plaintiff has demonstrated an overvaluation of its billboards, and a reduction in value is in order. Finally, the court concludes that there is *Page 459 
no evidence of double taxation of Plaintiff's signs #5 and #7. Accordingly,
1. Defendant shall calculate the RMV for the nine billboards using a January 1, 2002, total RMV of $175,000.
2. Defendant shall allocate that value as it deems appropriate among the nine billboards.
3. Defendant shall then apply the 2.06 percent backward trend to each value to establish a base year RMV for each billboard, based on the earliest year of assessment for each account. That assessment date is January 1, 2000, for all but one account; sign #4 (Account 10985387) was only added to the rolls back to the 2001-02 tax year, and therefore has an assessment date of January 1, 2001.
4. Defendant shall then apply the applicable CPR (as discussed above) to each account to establish the respective MAVs and determine the appropriate assessed value (AV) as provided under law as the lesser of RMV and MAV.
5. Defendant shall calculate the RMVs for each year subsequent to the relevant base year as provided in ORS 309.115.
6. Finally, Defendant shall index the AV in accordance with ORS308.146. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's appeal on the classification of the billboards is denied, and that the billboards shall be classified as real property;
IT IS FURTHER DECIDED that Plaintiff's appeal seeking a reduction in value is granted, and Defendant shall reduce the values of the subject property in accordance with the above, refunding any excess taxes paid with statutory interest; and
IT IS FURTHER DECIDED that Plaintiff's appeal on the issue of double taxation is denied.
[1] The notices of intent were all issued in 2006, but the value for one of the signs (#4) was not added to the rolls until March 5, 2007.
[2] The account numbers at issue are 10984032 (Tax Court Case Number 070136C), 10984033 (Case Number 070137C), 10984025 (Case Number 070138C), 10985387 (Case Number 070139C), 10984031 (Case Number 070140C), 10984030 (Case Number 070141C), 10984026 (Case Number 070142C), 10984052 (Case Number 070143C), and 10984028 (Case Number 070144C).
[3] Although seven of the nine omit assessments include values for the 2006-07 tax year, Defendant has represented to the court that Plaintiff received regular property tax statements in 2006 and that the omit assessments only address tax years 2005-06 and earlier. Plaintiff did not challenge that assertion and the court accepts it as true.
[4] Unless noted otherwise, all references to the Oregon Revised Statutes (ORS) are to 2005.
[5] All references to the Oregon Administration Rules (OAR) are to 2005.
[6] The court's conclusion about the continuation of the permit requirement imposed by the legislative amendments in 2007 is confirmed by a letter sent to Croft by Oregon Department of Transportation (ODOT) on June 1, 2007, which references House Bill 2273-A and then states that "[t]his bill reinstates the permit requirement and changes the way we classify signs to satisfy the concerns of the Supreme Court."
[7] Prior to the 2007 amendments, the allowance for pre-existing signs only covered signs in existence prior to June 12, 1975, whereas ORS 377.712, as amended, encompasses "any outdoor advertising sign in existence on May 30, 2007." The subject signs were constructed between 1993 and 2000.
[8] The county may have exceeded its authority under ORS311.216 in terms of the number of years for which it added value, because that statute requires the assessor to give notice as provided in ORS 311.219 of property omitted from assessment and taxation for a period of time "not exceeding five years prior to the last certified roll." The notices in this case required by ORS 311.219 for six of the nine signs were issued on October 12, 2006; of the remaining three, two were issued in December 2006, and the third in July 2006. However, the issue of whether the assessor exceeded his authority has not been raised, and there is no evidence before the court on which to make a determination (the court does not know when the 2006 roll was certified).
[9] ORS 305.412 provides:
 "When the determination of real market value or the correct valuation of any property subject to special assessment is an issue before the tax court, the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."
[10] The applicable statute is ORS 305.427, and it provides as follows: "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."
[11] Typically, the property owner is the only party seeking relief in a property value appeal, and the court begins its analysis by looking at that party's evidence to determine if they have met their burden of proof. If not, the assessor's evidence need not be analyzed, as the court simply sustains the roll value. Here, both parties are seeking relief, and the court must therefore consider the evidence from each side to determine if either is entitled to relief. *Page 460