IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DOUG SCHMIDT,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　　)　TC-MD 150114C
　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
HARNEY COUNTY ASSESSOR,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.　　　　　　　　)　**FINAL DECISION**


　　　　This Final Decision incorporates without change the court's Decision, entered

October 14, 2015.  The court did not receive a statement of costs and disbursements within 14

days after its Decision was entered.  *See* TCR-MD 16 C(1).

　　　　Plaintiff appeals the real market value of a grocery store in Hines, Oregon, identified as

Account 30050 for the 2014-15 tax year.  Plaintiff is only appealing the value of the building

(subject property).  A trial was held in the courtroom of the Oregon Tax Court in Salem on

August 3, 2015.  Darrell Deglow (Deglow) appeared on behalf of Plaintiff.  Brad Janoush

(Janoush) appeared on behalf of Defendant.  Ted J. Tiller (Tiller) testified on behalf of

Defendant.  Plaintiff's Exhibit 1 was received without objection.  Defendant's Exhibit A was

received without objection.

## I.  STATEMENT OF FACTS

　　　　Plaintiff appeals the real market value (RMV) of the subject property's improvements

(structure) only.[1]  In their appraisal reports, the parties had slightly different numbers for the size

of the building, but agreed at trial that the structure is a 26,860-square-foot commercial building

in Hines, Oregon.  It was built in 1978 and is situated on a 3.72 acre rectangular lot along

---

[1] The land has been valued at $252,800, and is not in dispute.  (Ptf's Compl at 2-3).

Highway 20 (Central Oregon Highway), the main thoroughfare in Harney County. (Ptf's Ex 1 at 20, 23.) The building was designed and constructed for use as a single-tenant grocery store and is currently operated as a Thriftway grocery store. (Ptf's Ex 1 at 23; Def's Ex A at 6, 7.) The subject property is in Harney County, which the parties agree is a sparsely populated county in central or eastern Oregon with a low and declining population and high rate of unemployment. (Ptf's Ex 1 at 41-42; Def's Ex A at 10.)

Both Deglow and Janoush testified that the subject property has been continuously occupied and operated as a grocery store since it was developed in 1978. Janoush testified that the subject property is in the first commercial area entering the town of Hines from the town of Burns, which is west of and immediately adjacent to Hines. Both appraisers testified that the subject property is in a well-developed commercial area adjacent to other retail stores, restaurants, and motels. (*See also* Def's Ex A at 16.) The parties agree that the subject property has 270 linear feet of frontage on Highway 20. (Ptf's Ex 1 at 20; Def's Ex A at 18.)

The RMV on the assessment and tax rolls for the 2014-15 tax year is $843,710, with $590,910 allocated to the structures.[2] (Ptf's Compl at 3) As previously noted, the value of the land ($252,800) is not at issue. (*See id.*). Plaintiff appealed the RMV to the county board of property tax appeals (Board) and the Board sustained the assessor's values. (*Id.*) In his Complaint, Plaintiff requested an improvement RMV of $287,200, yielding a total RMV of $540,000. (*Id.* at 2.) Plaintiff submitted into evidence an appraisal prepared by Deglow to support his requested reduction in the property's improvement RMV. (Ptf's Ex 1 at 55.) Deglow estimated the value as of January 1, 2014. (*Id.*) Defendant submitted into evidence an

---

[2] Plaintiff stated in its Complaint (Section 4) that the RMV improvement value was $591,910, but the Order of the county board of property tax appeals (Board) shows the RMV improvement value at $590,910, a difference of $1,000. (Ptf's Compl at 3.) The court will accept the value on the Board's Order.

appraisal report prepared by Janoush. The appraisal indicates that the effective date of Janoush's valuation is May 6, 2015. (Def's Ex A at 1, 7.) Janoush repeatedly confirmed the May 6, 2015, valuation date during cross-examination.

A.    *Plaintiff's Valuation*

In its valuation of the subject property, Plaintiff relied exclusively on Deglow's appraisal report and testimony. Deglow testified that he originally inspected the subject property on October 9, 2013, which included a complete interior and exterior inspection. Deglow testified that the purpose of this inspection was to assess the value of the subject property in order for the group of owners to buy out one of their retiring owners. Deglow's valuation for the buyout is the same as his value conclusion for this appeal: $540,000 as of January 1, 2014. (Ptf's Ex 1 at 55.)

Deglow testified that he considered both the cost approach and the income capitalization approach but rejected both. Deglow wrote in his appraisal that "[t]he Cost Approach is best utilized when the improvements are new[,] and * * * [i]n this case, the subject improvement was constructed in 1978." (Ptf's Ex 1 at 12.) Deglow added: "With a building of this age, ongoing normal physical depreciation is evident. As a result, very subjective estimates of depreciation would be required which greatly diminishes the reliability and applicability of this approach to value." (*Id*.) Deglow testified that due to the lack of sales data in the region there is no way to prove either physical deterioration or external obsolescence. Deglow's report echoed those concerns. (*See id*.) Deglow testified that he did not use the income capitalization approach because the unique size and location of the building made market data scarce. Deglow explained in his appraisal report that

> "application of an Income Capitalization Approach requires several components
> which must be supported by market data. First, the market rent must be supported
> by rent comparables of other grocery stores in similar competing areas. I have
> researched all of the eastern Oregon counties and was unable to locate any

> comparable rental data * * * supporting market rent for the subject property. Second, vacancy and operating expense data must also be supported; however this is also a component which lacks any relevant market support. Finally, and most critical, is the estimation and market support of an overall capitalization rate. A cap rate must be extracted from the comparable sales which were transacted on an investment grade level involving a fully leased property with buyers and sellers motivated by investment gain. In this situation, the Appraiser was unable to locate any sales which could be considered supportive or reliable."

(Ptf's Ex 1 at 12.)

Plaintiff relied exclusively on the sales comparison approach to value the structure. *Id.* Deglow testified that he searched all of eastern Oregon for owner-occupied property to compare the subject property against. Unable to find any owner-occupied comparables, Deglow testified that he widened his parameters to any commercial property that "had some relative meaning to owner occupancy." Deglow testified that these new parameters produced prospective comparables that Deglow then narrowed by limiting his search to sales within the previous three years of the assessment date.

In using the sales comparison approach Plaintiff relied on four comparable properties. Comparable sale 1 was a vacant retail building in Klamath Falls, Oregon. (Ptf's Ex 1 at 46.) The property had been foreclosed, and Deglow testified that he had talked with the broker who assured him the sale was an arm's-length transaction. Comparable sale 1 was built in 1974 as a full service grocery store. (*Id.* at 45.) The building was 30,300 square feet, and sold for $550,000, or $18.15 per square foot. (*Id.*) The list price at the time of sale was $675,000. (*Id.* at 46.) The sale occurred in January 2012. (*Id.*) The building was on the market for 362 days. (*Id.* at 45.) According to Deglow's appraisal, "[t]he property was vacant for the entire listing period of approximately one year after foreclosure while it was under the ownership of Bank of America." (*Id.*) Deglow testified that, in his opinion, the approximately one year listing period was a reasonable time on the market.

Comparable sale 2 was a "free-standing full service grocery store constructed in 1992." (Ptf's Ex 1 at 47.) This property had good traffic exposure and was located in The Dalles, Oregon. (*Id.*) "First American Title Insurance [seller] acquired the property as a result of legal action against the title company by a prior owner. The broker indicated that the deal was arm's length." (*Id.* at 48.) The building was 41,593 square feet and sold for $1,500,000, or $36.06 per square foot. (*Id.* at 47.) The sale occurred in March 2012. (*Id.*) The building was on the market for 436 days, which Deglow testified was a reasonable time on the market. (*See id.*)

Comparable sale 3 was a two-story free-standing retail building constructed in 1987 in Bend, Oregon. (Ptf's Ex 1 at 49.) According to Deglow's appraisal, "[t]his property was purchased for use as an owner-occupied thrift store run by the Human[e] Society of Central Oregon. The sale was reported to be an arm's length transaction with cash to the seller." (*Id.* at 50.) The building was 23,836 square feet and sold in December 2012 for $1,365,000, or $57.27 per square foot. (*Id.* at 49.) The first floor was 16,240 square feet in size and the second floor mezzanine was 7,596 square feet. (*Id.*) The building was on the market for 174 days, which Deglow testified was a reasonable time on the market. (*Id.*)

Comparable sale 4 differed from the subject property in that the sale consisted of two buildings in Redmond, Oregon. The first was a 14,500 square foot retail building. (*Id.* at 51.) The second building was a 4,000 square foot office building. (*Id.* at 52.) Both buildings were constructed in 1974. (*Id.* at 51-52.) The sale included "surplus land" which was excluded from the total cost of the sale in the appraisal report. (*Id.* at 52.) The adjusted sale price of the two buildings was $623,850, or $33.54 per square foot. (*Id.*) The sale occurred in November 2012, and had been on the market for 280 days. (*Id.* at 51.)

/ / /

Deglow concluded that comparable sales 1 and 2 were the most similar to the subject property and were given the most weight in arriving at his opinion of value. (Ptf's Ex 1 at 54.) Deglow testified that all of the comparables were superior to the subject when considering all factors. Deglow testified that after analyzing all the comparables, he used a qualitative approach and determined that the subject property had a value of $20 per square foot. (*See also id.* at 54.) That resulted in a total RMV estimate of $537,000, a figure slightly less than the $540,000 value estimate in Deglow's appraisal report, a difference attributed to the slightly smaller agreed-upon size of the building.[3] (*Id.*) At trial Deglow subtracted the $252,800 land RMV on the assessment and tax rolls from his $537,000 total RMV estimate for the subject property and arrived at an improvement RMV of $284,200.

B.      *Defendant's Appraisal*

Janoush valued the property (the improvement) using both the cost and sales comparison approaches. (Def's Ex A at 9, 25-30.) As indicated above, Janoush's appraisal presents an opinion of value as of May 6, 2015. (*Id.* at 1, 7.) Janoush opined in his appraisal that the sales comparison approach was the most reliable method for valuing the subject property for three reasons: 1) there was "an active market for similar properties, and sufficient sales data [was] available for analysis[;]" 2) the sales comparison approach "considers the prices of alternative properties having similar utility[;]" and 3) the sales comparison approach "is typically most relevant for owner-user properties." (*Id.* at 9.) Janoush used the cost approach because he felt there was "sufficient information to estimate replacement cost of the improvements, and accrued depreciation." (*Id.*)

/ / /

_____

[3] As noted above, the parties agreed that the size of the building is 26,860 square feet. Deglow had calculated the size of the billing to be slightly larger, at 26,990 square feet. (Ptf's Ex 1 at 54.)

For his cost approach, Janoush estimated a replacement cost new of $3,004,991. (*Id.* at 25.) After making numerous adjustments including a 50 percent adjustment for age–life depreciation, which amounted to a reduction of $1,445,171, and a 25 percent adjustment for external obsolescence, which equated to a reduction of $722,585, Janoush calculated the depreciated replacement cost for the improvement to be $740,000 (rounded). (*Id.* at 25-26.)

Janoush used 17 sales for his sales comparison approach. (*Id.* at 26-28.) Janoush testified that he used comparable sales located in eastern Oregon and Western Idaho; none of the comparables were located in Harney County.[4] Janoush's sales occurred between 2003 and 2014. His comparable sales ranged in size from approximately 4,900 square feet (sale 17) to approximately 157,000 square feet (sale 13). On a per-square-foot basis, Janoush's comparables sold for a range of between $24 per square foot (sale 17) to $170 per square foot (sale 1). Janoush testified that the "midpoint" was $73 per square foot. Janoush did not make any adjustments to his comparable sales to account for changes in market conditions occurring between the January 1, 2014, assessment date and his May 6, 2015, valuation date. (Def's Ex A at 28-30.) That omission is discussed below.

## II. ANALYSIS

A.    *RMV—Statutes, Rules and Case Law*

The issue before the court is the RMV of the subject property, a 26,860-square-foot commercial property operating as a grocery store. The tax year at issue is 2014-15.

In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[5]

---

[4] Although his appraisal does not identify the county in which is various comparables are located, none of those sales appear to involve properties in Harney County. (Def's Ex A at 28-30.)

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

RMV is defined in ORS 308.205(1) as follows:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2014-15 tax year was January 1, 2014. *See* ORS 308.007; ORS 308.210.

RMV is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property, although they need not all be developed. *See* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of a given property); *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). When value is appealed to the court, the approach to be used (or combination of approaches) "is a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that a "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 394, 737 P.2d 595 (1987) (explaining that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' ").

/ / /

The burden of proof requires that the party seeking relief (Plaintiff in this case) provide evidence to support its argument. The evidence that a plaintiff provides must be competent evidence of the requested RMV of the property. *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

Finally, "[t]he value of property is ultimately a question of fact[.]" *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001). The court has the statutory authority to determine real market value "without regard to the values pleaded by the parties." ORS 305.412.

B.  *Evaluation of the Parties' Evidence*

1.  *Defendant's evidence*

Ordinarily, if the plaintiff establishes the likelihood of an error in the record assessment, the court evaluates the evidence of both parties to arrive at a determination of RMV. In this case, however, Defendant's appraisal presents an opinion of value as of May 6, 2015. That date is approximately 16 months after the January 1, 2014, statutory assessment date and Defendant did not adjust its comparables to the January 1, 2014, assessment date. On the contrary, Defendant's appraiser clearly indicates that the "effective date of the appraisal" is May 6, 2015. (Def's Ex A at 1, 7, 41.) Janoush indicates in that appraisal that

> "[t]he purpose of the appraisal is to develop an opinion of the market value as is of the fee simple interest in the property as of the effective date of the appraisal, May 6, 2015. The date of the report is June 1, 2015. *The appraisal is valid only as of the stated effective date or dates*."

(*Id*. at 7 (emphasis added).)

Because Defendant's appraisal report presents an opinion of value 16 months after the applicable assessment date, the court gives that appraisal no weight in determining the RMV of the subject property. Defendant did not present any other evidence of the market value of the

subject property as of the assessment date. Accordingly, the court's focus is on Plaintiff's evidence, including his appraisal report.

2. *Plaintiff's evidence*

As indicated above, Plaintiff did not do an income or cost approach in estimating the value of the subject property, relying instead solely on the sales comparison approach. Given the age of the building, the court agrees that the cost approach is not a particularly valid method for valuing the subject property. This court has previously noted that " '[t]he [cost] approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the highest and best use of the land as though vacant.' " *Wittemyer v. Multnomah County Assessor*, TC-MD 110493C, WL 3017241 at *4 (July 24, 2012) (quoting Appraisal Institute, *The Appraisal of Real Estate* 382 (13th ed 2008) (second alteration in original). The subject property in this case was constructed in 1978. The age of the property renders the cost approach of little or no value in determining the RMV.

As for the income approach, Deglow explained that there was no comparable rental data available for establishing market rent (*i.e.*, potential gross income), which is the starting point for the income approach. Deglow explains in his appraisal report that the same problem is confronted with regard to expense data and derivation of an income capitalization rate. (Ptf's Ex 1 at 12.) In *Allen v. Department of Revenue*, 17 OTR 248, 253 (2003), this court noted that "[t]he income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces. *See Union Pacific Railroad v. Dept. of Rev.* 315 Or 11, 20, 843 P2d 864 (1992). That boils down to present value being equal to what an investor believes the property could earn for her in the future." Given the

uncontroverted testimony that there was virtually no market data available regarding the potential income for the subject property, the court accepts Plaintiff's assertion that the income approach is inapplicable in this case. That leaves the court with an analysis of Plaintiff's sales comparison approach.

Deglow used four property sales as comparables. (Ptf's Ex 1 at 53.) Deglow began with "a search for sales of full-service grocery stores * * * [that] originally focused on the eastern Oregon region[.]" (*Id*. at 44.) However, Deglow explains in his report that "no sales could be located over a three year time period * * * [that satisfied his search criteria, and] [a]s a result, [he] expanded [his] search to Central Oregon and Southern Oregon where market conditions are superior but provide a more stable basis of property comparability." (*Id*.) Deglow's comparables bracket the subject property in terms of size, ranging from a low of 18,600 square feet to a high of 41,593 square feet compared to the subject property at 26,860 square feet. (*Id*. at 53.) The subject property was built in 1978 and the comparables were built in 1974, 1992, 1987, and 1974, respectively for sales 1 through 4. (*Id*.) Deglow's comparables sold on a per-square-foot basis for $18.15, $36.06, $57.27, and $33.54, respectively. (*Id*.) Deglow concluded that comparable sales 1 and 2 were "most similar to the subject property," with comparable sale 1 being "highly similar to the subject property in regards to age, quality and condition." (*Id*. at 54.) Deglow indicates that he "placed most weight on comparable sale #1 with a high level of support placed on comparable sale #2." (*Id*.) Deglow states that "[a]s a result, [he] * * * concluded a unit value of $20 per square foot for the subject property." (*Id*.) At trial, Deglow multiplied his $20 per square foot value estimate by the size of the subject property, which the parties agreed is 26,860 square feet, to arrive at a total value for the subject property of $537,200, which Deglow rounded to $537,000. Deglow then subtracted the value of the land

which is on the rolls at $252,800, and arrived at an opinion of value for the subject property (building only) of $284,200. The improvement value on the assessment and tax rolls is $590,910. (Ptf's Compl at 3.)

The court has several concerns with Deglow's value opinion under the sales comparison approach. Deglow describes all four comparables as superior in terms of location, but he made no specific adjustment to the comparables to account for that difference. Similarly, all of Deglow's comparables sold in 2012, more than one year prior to the January 1, 2014, assessment date. Yet, as with the locational difference, Deglow made no specific dollar adjustment to account for any change in market conditions between the sales dates of his comparable sales and the assessment date. Deglow indicates that his two most reliable comparable sales, sales 1 and 2, sold in January and March of 2012, a span of nearly two years prior to the January 1, 2014, assessment date. Deglow did address that issue in his appraisal, explaining that "[t]he comparable data is analyzed based on the sale price per square foot of gross building area. In this particular case, the comparables have been analyzed on a *qualitative* basis." (Ptf's Ex 1 at 44 (emphasis added).) Deglow went on to explain that

> "[t]he current level of comparable data is considered to be somewhat scattered due to the physical and locational differences involved. In addition, the market for the subject property involving grocery stores and competing larger box retail stores still appears to be very soft. As a result, a quantitative method is not considered to be applicable as *individual adjustments cannot be supported with market data*."

(*Id*. (emphasis added).) This court has seen qualitative adjustments made by appraisers applied to specific differences between comparable sales and the subject property. In this case, however, Deglow did not make any such specific adjustments, but rather noted the differences between his comparables and the subject property and concluded with a generalized statement that he "concluded a unit value of $20 per square foot for the subject property." (*Id*. at 54.) Deglow is

an experienced and qualified appraiser, with more than 30 years of appraisal experience and an MAI designation from the Appraisal Institute. (*Id*. at 56.) Those credentials notwithstanding, the court needs more than an appraiser's unexplained conclusion if it is to find the appraiser's opinion of value to be persuasive.

The court has two additional concerns with Deglow's value opinion under the sales comparison approach. First, Deglow's best comparable, sale 1, was a bank foreclosure involving a property that was developed as a grocery store but owned and occupied by a furniture store prior to the foreclosure. (*Id*. at 46.) The property was also vacant at the time of sale. (*Id*. at 53.) Those factors indicate a possible element of duress, a possibility Deglow dismissed on cross-examination by testifying that when he confirmed the sale the broker told him that the sale was arm's-length. That testimony is hearsay because the broker was not available at trial to testify firsthand and be subjected to cross-examination. Deglow also reports that the property was superior "in regards to location as the population base is larger and the unemployment rate is lower," yet, at $18.15 per square foot, it sold for considerably less than Deglow's other three comparables, which sold for between $33.54 per square foot and $57.27 per square foot. (*Id*.) That disparity in the sale price of sale 1 compared to Deglow's other three comparable sales contributes to the court's concern that the sale may have involved an element of duress.

That brings the court to its final concern with Deglow's appraisal. Deglow's best comparable, sale 1, sold for $18.15 per square foot and his next closest comparable is sale 4, which sold for nearly twice that amount at $33.54 per square foot. (*Id*.) Deglow's other two comparables sold for $36.06 and $57.27 per square foot. (*Id*.) Yet Deglow concludes that $20 per square foot is appropriate for the subject property. (*Id*. at 54.) The rationale for that

/ / /

conclusion was vague and unpersuasive. Deglow simply explains that he used a qualitative approach, presumably based on experience and appraisal judgment.

This court has previously noted that the plaintiff must provide competent evidence of the requested RMV in order to sustain the burden of proof. *Woods*, 16 OTR at 59. "Competent evidence includes appraisal reports and sales [of comparable properties] adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD 110300D, WL 879285 (Mar 13, 2012). In evaluating the evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments to account for differences. Adjustments are a key component in evaluating properties. This is "[b]ecause sales are seldom comparable in every detail." *Ward v. Dept. of Revenue*, 293 Or 506, 511, 650 P2d 923 (1982). Raw, unrefined price information or other generalized data is not enough, nor is averaging a preferred technique. *Krebs v. Multnomah County Assessor*, TC-MD 080214B, WL 5192615 at *2 (Nov 28, 2008).

### III. CONCLUSION

The court has carefully considered the evidence presented and concludes that Plaintiff has failed to establish by a preponderance of the evidence that a reduction in the RMV of the subject property, identified as Assessor's Account 30050, is warranted for the 2014-15 tax year. Now, therefore,

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of November 2015.

 

 

 

_____

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on November 2, 2015.*